Rodríguez García, Juez Ponente
*1027 TEXTO COMPLETO DE LA SENTENCIA
Trátase en el presente recurso de una controversia sobre una alegada servidumbre afectando determinados solares creados en un desarrollo extenso denominado Haciendas Parque de San Lorenzo, en el Municipio de ese nombre. La parte demandante impugnó mediante una acción de negatoria de servidumbre, la imposición de dicho gravamen real a su fundo ante el Tribunal de Primera Instancia, Sala de Caguas. Dicho tribunal resolvió que existía la alegada servidumbre con el efecto de gravamen sobre el fundo de la parte demandante, como parte sirviente. Revocamos ese aspecto de la controversia, sin entrar a resolver el impacto de la alegada servidumbre sobre los fundos de quienes no la han impugnado en este proceso, y aceptan su posición como predio dominante uno, el de González, y sirviente el otro, el de Benitez.
*1028 I. TRASFONDO FACTICO Y PROCESAL
Para facilitar la claridad de los hechos en el presente caso, conviene que m filizadí ] vueltas y la parcela o solar que pertenece a cada una de las partes envueltas. El esquemá iitilizado-is lma séccióri de un plano que incluye el desarrollo extenso denominado Parque de San Lorenzo en ese Municipio, preparado por el Agrimensor.
(1) Los demandantes RAFAEL PRINCIPE SANTIAGO, ZAIDA TORRES LEON Y LA SOCIEDAD DE GANANCIALES, son dueños de la finca #9,196, de San Lorenzo, la cual designamos FINCA A, en el diagrama que se une a la presente SENTENCIA como ANEJO I. En el plano original se identifica como 4-9.
(2) Los demandados JOSE L. BENITEZ SANCHEZ, NELLY GONZALEZ JULIO, son dueños de la finca #14,468 de San Lorenzo, la cual designamos FINCA B, en el ANEJO I de la sentencia. En el plano original se identifica como 1-11.
(3) Los interventores SAMUEL GONZALEZ GONZALEZ, ID ALIA CORDERO MUÑOZ, Y LA SOCIEDAD DE GANANCIALES, son dueños de la finca #14,469 de San Lorenzo, la cual designamos FINCA C, en el ANEJO I. En el plano original se identifica como 2-11.
i. Los hechos según se exponen en el escrito de apelación por los apelantes.
En su escrito de apelación, la parte apelante compuesta por don Rafael Príncipe Santiago, su esposa Zaida Torres León y la Sociedad de Gananciales que componen, exponen los hechos del siguiente modo:

“La parte demandante es dueña en pleno dominio de la finca núm. 9,196 con una cabida superficial de 7,878 m.c., radicada en el Barrio Quebrada de San Lorenzo; inscrita alfolio núm. 142 vuelto del tomo núm. 183, de San Lorenzo, Sección Segunda de Caguas, Puerto Rico. (Apéndice, anejo I, págs. 1-4)

Adquirió la propiedad de los esposos Héctor Luis Meléndez Castro, y Magdalena Rivera Luciano, por escritura núm. 111, de Compraventa, otorgada en San Juan, Puerto Rico, el 7 de abril de 1994, ante el notario Jorge E. Rivera Ortiz. (Apéndice, anejo IV, págs. 13-19)

Los esposos Meléndez Rivera, a su vez, adquirieron dicha propiedad por compra a los desarrolladores del Proyecto conocido como Haciendas Parque de San Lorenzo, Plinio Alfaro Umpierre y Miriam López Mosquera y Frosan Development Inc., según consta de la escritura número 32 otorgada en Trujillo Alto, Puerto Rico, el día 21 de abril de 1988, ante el notario Carlos A. Irizarry Vázquez. (Apéndice, anejo V, págs. 20-26)

De las dos escrituras antes mencionadas no surge que la finca del demandante esté gravada por servidumbre de paso alguna.

Mediante escritura núm. 34, de Partición de Bienes, otorgada en Carolina, Puerto Rico, el día 5 de junio de 1989, ante la notario, Elba I. Santiago, los desarrolladores del Proyecto Frosan Development Inc., y los esposos Plinio Alfaro Umpierre y Miriam López Mosquera, dividieron la Comunidad de Bienes que existía entre ellos, como dueños y se le adjudica a los esposos Alfaro López entre otras, las fincas números 14,468 y 14,469, ahora propiedades del demandado y de la parte Interventora respectivamente. (Apéndice, anejo núm. VI, págs. 27-34).

Mediante dicha escritura núm. 34, los esposos Alfaro López constituyeron una servidumbre de paso a través de la finca núm. 9,196 para dar acceso a la finca #14,469, sobre ésta para dar acceso a la finca #9,198 y sobre ésta para dar acceso a la finca #14,492. Todas estas fincas' eran propiedades de dichos esposos con 
*1029
excepción de la núm. 9,196 que poco más de un año antes había sido vendida al Sr. Héctor Meléndez y esposa, mediante la escritura 32 antes mencionada.

La escritura núm. 34, mediante la cual se constituye la servidumbre de paso, no pudo ser inscrita en el Registro de la Propiedad del Distrito por adolecer de varios defectos entre otros, el gravamen impuesto a la finca #9,196 por esta NO ser propiedad de los otorgantes y el dueño de la finca no haber comparecido en el documento a prestar su consentimiento.

Mediante escritura núm. 78, sobre Acta Aclaratoria, otorgada en Caguas, Puerto Rico, el día 10 de diciembre de 1990, ante el notario José A. Martínez Oquendo, los comparecientes de dicha escritura núm. 34, aclaran entre otras cosas la descripción de las fincas sujeta al gravamen de la servidumbre de paso, se describe la faja de terreno sobre la cual se constituye la servidumbre y en las fincas objeto del gravamen, no se incluye la finca #9,196 propiedad ahora del demandante. (Apéndice, anejo Vil, págs. 35-40)

En el hecho quinto, folio num. 5 de dicho documento, se dispone lo siguiente: Expresan y hacen constar los comparecientes que la parte de la referida escritura número Treinta y Cuatro (34) que trata sobre la constitución de la servidumbre se de por modificada según lo que exponen en la presente Acta Aclaratoria.

De las constancias del Registro de la Propiedad, Sección Segunda de Caguas, NO consta inscrita servidumbre de paso alguna que grave o afecte la propiedad del demandante. Por otro lado, sí consta inscrito dicho gravamen en cuanto a las demás fincas antes mencionada. (Apéndice, anejo VIII, págs. 41-45) Certificación expedida por la Registradora de la Propiedad, Sección Segunda de Caguas, en relación con la finca #9,196 propiedad de la parte demandante.

El camino objeto de la controversia era usado como entrada y salida de la finca por parte del anterior dueño Héctor Meléndez y familia y luego por el demandante después que la adquirió. El camino forma parte de la cabida de la finca del demandante, comienza en la calle municipal dividiendo la finca y servía de acceso para éste y su familia llegar a su casa, construida retirada de la carretera.

La finca del demandante num. 9,196, es el remanente de una finca con cabida originalmente de 5 cuerdas la cual en virtud de segregaciones quedó reducida a 7,878.98 metros; valga aclarar que las fincas sobre las cuales se constituye la servidumbre mediante las escrituras núms. 34 y 78 antes mencionadas, no son segregaciones de la finca núm. 9,196. ” (Véase Certificación Registral, Apéndice, anejo VI, supra.)
La versión que ofrece la parte demandante no fue rebatida por la parte demandada compuesta por la parte demandada original, José L. Benitez Sánchez, en los aspectos fundamentales de la misma, como veremos en el análisis y disposición del caso.
Del mismo modo, la parte interventora que consiste de Samuel González González, Ana Idalie Cordero Muñoz, y la Sociedad de Gananciales que componen, tampoco rebaten en su comparecencia los aspectos fundamentales de las alegaciones de la parte demandante.
La posición de Benitez y González es que los dueños originales de la finca, los cuales no son parte en el presente pleito, una corporación denominada Frosan Development, Inc., y su Presidente, Ing. Enrique Santiago Rodríguez, constituyeron una servidumbre antes de que se realizaran las ventas de los solares afectados por la alegada servidumbre, y que la alegada servidumbre se manifiesta en el terreno por signos aparentes.
Ello no es correcto. Una servidumbre no nace como tal, hasta el momento en que el o los propietarios de una finca principal, segregan una parcela para venderla o cederla, y es allí y entonces que esa finca original, si queda enclavada, pasa a obtener una servidumbre. Cuando se realizó la primera venta al señor Héctor *1030 Meléndez, en el año 1987, no había finca enclavada alguna, requiriendo servidumbre. Todas las demás parcelas de la finca original, tienen acceso al camino público o real, que los desarrolladores designaron en el plano maestro.
Veremos que como parte del desarrollo de una urbanización de 76 solares, que consistió de dividir trece (13) finquitas de cinco cuerdas, utilizando el recurso de "lotificación simple", fue necesario para los desarrolladores preparar un camino de servicio de carácter temporero para mover terreno y piedra de la parte alta de la finca, y luego para facilitar la venta de unos solares irregulares se les ocurrió designar como servidumbre el camino de servicio. Instaurada la demanda por los esposos Príncipe, los demandados presentaron una moción de sentencia sumaria, y el Tribunal de Primera Instancia dictó la sentencia solicitada por los demandados y los interventores, desestimando la demanda!
Los demandantes apelaron .de aquella sentencia ante nos en el caso identificado alfanuméricamente como KLAN-98-00300.
ii. Los hechos según los expuso este Tribunal en una anterior apelación.
Originalmente, el tribunal apelado dictó una sentencia sumaria desestimando la demanda, y los apelantes acudieron ante este Tribunal de Apelaciones con un recurso, en el caso KLAN-98-00300. Dispone la Regla 11 de Evidencia, 32 L.P.R.A. Ap. IV, R 11, que los tribunales podemos tomar conocimiento judicial de aquel caso ante nos, por ser susceptible de determinación inmediata y exacta, (Inciso (A)(2)), a iniciativa propia (Inciso (B), y en la etapa apelativa (inciso D). Hacemos constar que hemos de tomar conocimiento judicial del contenido de aquel caso ante nos.
Este Foro entendió que la situación factual de aquel caso, según presentada por las partes era la siguiente:
“El señor Rafael Príncipe Santiago y su esposa Zaida Torres León adquirieron de los esposos Héctor Luis Meléndez Castro y Magdalena Rivera, mediante escritura pública otorgada el 7 de abril de 1994, un solar de dos (2) cuerdas localizado en el Barrio Quebrada del Municipio de San Lorenzo. Dicho solar era el remanente de una finca de mayor cabida identificada con el número 9,196.
Los esposos Meléndez a su vez habían adquirido la referida propiedad de los esposos Plinio Alfaro Umpierre y Miriam López Mosquera y de Frosan Development Inc. mediante escritura pública otorgada el 21 de abril de 1988. En el momento del otorgamiento, los vendedores certificaron que la propiedad estaba libre de cargas y gravámenes hipotecarios.

Posteriormente, el 5 de junio de 1989, mediante escritura pública, los esposos Alfaro López y Frosan decidieron dividir en partes iguales otras fincas que poseían en comunidad.

Con dicho fin otorgaron la escritura 34 titulada Partición de Bienes y Constitución de Servidumbre. Como resultado de ello, correspondió a los esposos Alfaro López los solares identificados con el número (6-5) finca 14,807; el número (1-11) finca número 14,468; el (2-11) finca número 14,469; el (3-11) finca 9,198 y el solar (5-10) finca 14,964. La corporación Frosan obtuvo la otra mitad de la finca, la cual en parte fue utilizada para el desarrollo del Proyecto Hacienda Parque de San Lorenzo.

Para servir a los predios adquiridos por los esposos Alfaro López, las partes constituyeron, en la misma escritura, una servidumbre de paso de diez metros (10.00m) de ancho, el cual tiene su origen desde una vía pública a través de las fincas 9,196; 14,468; 14,469; 9,198; y hasta la finca 14,492. Según se describe en la escritura, la servidumbre tiene "un rumbo, conforme al norte magnético de este a oeste”.

*1031 Según alega el apelante, el Registrador de la Propiedad denegó la inscripción de dicha escritura por cuanto la misma adolece del defecto de falta de tracto en el título, ya que los esposos Meléndez, dueños de la finca 9,196, no comparecieron a dicho acto a gravar su propiedad con dicha servidumbre. Alega además que con la intención de subsanar dicho defecto, el 10 de diciembre de 1990 se hizo un acta aclaratoria, el cual tampoco tuvo acceso al Registro.
Así las cosas, el 15 de febrero de 1996, el señor Príncipe y su esposa presentaron ante el Tribunal de Primera Instancia una acción de Negatoria de Servidumbre contra el señor José L. Benitez Sánchez, quien había adquirido el solar (1-11) finca número 14,468. Según alegó el señor Príncipe en su demanda, a pesar de que la propiedad del señor Benitez Sánchez no era una enclavada y tenía acceso a la carretera municipal, éste insistía en utilizar la entrada de su finca como acceso y había manifestado su oposición o que se cerrara la entrada o se variara la misma. En dicha acción, presentó demanda de intervención el señor Samuel González González y su esposa Ana Idalie Cordero Muñoz y la Sociedad de Gananciales compuesta por ambos. Alegaron que su derecho propietario sobre uno de los solares en disputa podría quedar afectado con la disposición final de este pleito.
El 11 de junio de 1996, el señor Benitez presentó una moción de sentencia sumaria. Alegó que de las alegaciones, contestaciones a interrogatorios, admisiones y otros documentos obrantes en autos se establece que no existe controversia real sustancial en cuanto a hechos materiales, por lo que procede se dicte sentencia sumaria a su favor. Que la servidumbre de paso en disputa ha existido inalterada desde su creación cuando las fincas formaban parte de una sola y no estaban segregadas.
En apoyo de su contención, acompañó una declaración jurada prestada por el Sr. Plinio Alfaro Umpierre y otra prestada por el señor Enrique Santiago Rodríguez, presidente de Frosan, quien participó activamente en la constitución, configuración y marcado de la servidumbre en cuestión.
El día 13 de agosto de 1996, la representación legal del señor Príncipe radicó su moción en oposición y solicitó a su vez se dictara sentencia sumaria a su favor. Alegó que la servidumbre de paso fue establecida cuando ya los predios no pertenecían a los mismos dueños, por lo que la misma no podía ser válidamente constituida. Acompañó con su moción copia de las escrituras número 111, 32, 34 y 78; copia de una declaración jurada prestada por el señor Príncipe, en la cual establece que según el Registro, la propiedad al momento de adquirirla, no estaba gravada con servidumbre de paso alguna, y no existía en aquel entonces signo aparente de camino o acceso hacia otras fincas; que de haber existido la misma no habría adquirido la propiedad. Acompañó otra declaración jurada suscrita por el Ingeniero Eduardo Lebrón Confieras quien es dueño del solar 3-6 para intentar establecer con ella que allá para el año 1961 cuando el señor Meléndez adquirió su propiedad, no existían los cunetones del camino.
Luego de los correspondientes trámites procesales, el 12 de mayo de 1997, el tribunal de instancia realizó una inspección ocular y el 4 de diciembre de ese mismo año declaró HA LUGAR la Moción de Sentencia Sumaria presentada por el demandado. Determinó que la servidumbre en cuestión fue establecida por los anteriores dueños que enajenaron las fincas, de las cuales son titulares las partes, sin que hubieren expresado su intención de hacer desaparecer la servidumbre. Ordenó al demandante pagar las costas, más quinientos ($500.00) dólares en concepto de honorarios de abogado a favor del demandado y otra cantidad igual a favor del interventor.
Inconforme con dicho dictamen, el señor Príncipe acudió ante este Tribunal mediante el recurso de apelación que nos ocupa. Imputa error al Tribunal al declarar HA LUGAR la Sentencia Sumaria sin celebración de vista y al imponerle el pago de honorarios de abogado.
En aquel recurso, este Foro resolvió en la parte dispositiva de la sentencia lo siguiente:

*1032
“El tribunal recurrido concluyó en su sentencia que "en este caso se cumplen los requisitos establecidos por el Tribunal Supremo en Fernández v. Consejo de Titulares del Condominio el Monte North Garden, supra. De los documentos presentados por el demandado en su moción de sentencia sumaria y los que en apoyo a ésta fueron posteriormente presentados y particularmente de los hechos esenciales e incontrovertidos que surgen de los referidos documentos, queda claro el concepto que los desarrolladores le imprimieron al proyecto y que éstos establecieron una servidumbre de paso por signo aparente a través de las fincas en cuestión". Cometió error al así determinar. ”

En este caso falta uno de los cuatro requisitos exigidos por el Artículo 477 del Código Civil para que la servidumbre de paso por signo aparente nazca a la vida jurídica. Esto es que haya sido establecido por el dueño de ambas fincas. El señor Príncipe logró controvertir el hecho fundamental relacionado al momento en que se estableció el signo aparente. Esto es, si se constituyó cuando los predios pertenecían al mismo dueño o si se estableció cuando las fincas estaban segregadas y pertenecían a diferentes dueños. Esa controversia de hechos impedía la aplicación del derecho y el que se dictara la sentencia sumaria.
Concluimos pues, que existe controversia sobre hechos esenciales en este caso. Por lo tanto, en aras de lograr nuestro fundamental principio, la justa solución de los casos, no encontramos que la situación planteada sea la adecuada para resolverse a través de sentencia sumaria, sino mediante la celebración de juicio.
iii. Los hechos que detectamos en esta apelación.
Para resolver como hoy lo hacemos, hemos analizado los documentos sometidos por las partes en el caso que ahora consideramos y los que obran en el expediente en apelación del caso KLAN-98-00300; la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. sec. 62 ss; la Ley Orgánica de la Administración de Reglamentos y Permisos (A.R.P.E.); Ley Núm. 76, de 24 de junio de 1975; 23 L.P.R.A. sec. 71 ss; la prueba documental que fue ofrecida al Tribunal de Primera Instancia por ambas partes, tanto la que fue admitida como la que fue rechazada indebidamente por el tribunal, ante fundamentos frívolos de las partes demandadas e interventoras; los alegatos de las partes y la exposición narrativa estipulada por las partes.
Analizado todo ello, detectamos los hechos relevantes ocurrieron del modo que pasamos a exponer:

“1. Don Plinio Alfaro Umpierre y Doña Miriam López Mosquera eran dueños de una finca que le compraron a “la viuda de Palés”, la cual ellos creían que originalmente era de 65 cuerdas, pero que "lo cierto es que se trataba de 13 fincas de cinco cuerdas cada una." (Testimonio de Alfaro Umpierre a la página 10 déla exposición narrativa estipulada). La fecha de esta compraventa no surge de ningún documento o del testimonio de ningún testigo, pero el Tribunal de Primera Instancia en su sentencia dice que fue en 1983.

2. En 1983, según la sentencia apelada, Alfaro Umpierre y su esposa establecieron una comunidad de bienes con una corporación llamada Frosán Development, Inc., cuyo presidente era el Ingeniero Civil Enrique Santiago Rodríguez, quien le compró un 50% de participación de las trece fincas, alegadamente "debidamente inscritas como fincas independientes ubicadas en el Barrio Quebradas del Municipio de San Lorenzo." (Declaración jurada de Santiago Rodríguez, autos originales página 208, sometida como parte de una Moción de Sentencia Sumaria.)

No desfiló en el juicio prueba documental alguna, ni Certificación Registral alguna, acreditativa de la "debida inscripción" de las trece (13) fincas de cinco (5) cuerdas, mencionadas.

Hubiera sido muy importante para hacer justicia en este caso que se conociera con certeza la fecha exacta en que se realizó la segregación y parcelación de la finca de 65 cuerdas, en finquitas de cinco (5) cuerdas.

*1033 La segregación y parcelación de la finca de sesenta y cinco (65) cuerdas, en trece parcelas de cinco . cuerdas, tendría que haber ocurrido antes de 29 de junio de 1964 en que se aprobó la Ley Núm. 116 de 1964, la cual limita la segregación de parcelas para uso agrícola, sin los debidos permisos de Planificación y A.R.P. E., afincas de veinticinco (25) cuerdas. Alfaro Umpierre sólo sabe que fue antes del 89, pero dice que no sabe fecha exacta.

3. Como parte de la moción de sentencia sumaria ante el Tribunal de Primera Instancia, la parte demandada sometió por su abogado, una declaración jurada que prestara el Ingeniero Enrique Santiago Rodríguez, en la que éste confirma lo declarado por Alfaro Umpierre.

Procede que expongamos un caveat en esta etapa de los procedimientos, sobre la declaración jurada del Ingeniero Santiago.

Esta persona no fue traída al pleito como parte, ni fue testigo en la vista en su fondo, ya que las partes demandadas renunciaron a presentarlo como testigo y lo pusieron a la disposición de la parte demandada, para impedir el efecto de la presunción de testimonio en contra. De manera que nada de lo que consta en la declaración jurada es prueba en el caso, ni es determinante en la disposición del caso ante nos.

Cabe señalar además que en la moción de sentencia sumaria que obra en los autos originales del caso, específicamente a la página 17, señala que los esposos Plinio Alfaro Umpierre, Myriam López Mosquera y Frosán Development, Inc., se conocerán en adelante como "Los Desarrolladores", y en adelante así nos hemos de referir a estas personas.

4. Toda vez que son las partes demandadas e interventoras las que presentan la declaración jurada de Santiago Rodríguez, la reproducimos aquí textualmente, ya que la misma nos ayuda a establecer la ilegalidad del desarrollo extenso denominado "Haciendas Parques de San Lorenzo", el cual se disfrazó como una lotificación simple. ”

A continuación lo contenido en la declaración jurada del desarrollador Ingeniero Santiago Rodríguez:

“DECLARACION JURADA

YO, ENRIQUE SANTIAGO RODRIGUEZ, mayor de edad, casado, ingeniero civil y vecino de Trujillo alto, Puerto Rico, BAJO JURAMENTO DECLARO:

1. Que la corporación Frosan Development, Inc., siendo yo su Presidente, compró un 50% de participación de 13 fincas debidamente inscritas como fincas independientes ubicadas en el Barrio Quebrada del municipio de San Lorenzo al señor Plinio Alfaro y su señora.

2. Que procedí a someter un plano de distribución eléctrica para darle servicio a las 13 fincas antes mencionadas, habiéndole dado instrucciones al Ingeniero que diseñó el plano para que hiciera el diseño con capacidad suficiente para que si estas fincas fueran divididas o segregadas hubiese capacidad suficiente para suplir la necesidad de energía eléctrica. Este plano fue radicado en la Autoridad de Energía Eléctrica y fue debidamente aprobado, estableciéndose una servidumbre eléctrica a través de todas las parcelas y a través de todas las calles.

3. Que procedí a diseñar un plano de distribución de agua para suplir las facilidades de agua para las 13 fincas, cuyo diseño se hizo con facilidades suficientes para suplir futuros desarrollos en las mencionadas fincas. Este plano fue sometido a la Autoridad de Acueductos y Alcantarillados, Oficina Regional de Caguas, fue aprobado y las facilidades fueron entregadas a laA.A.A.

*1034
4. Que preparé un plano de las calles para dar acceso a las 13 fincas. Este plano fue radicado en el Municipio de San Lorenzo yfué debidamente autorizado por el municipio.

5. Que Frosan Development, Inc. procedió a construir las calles de acceso a las 13 fincas donde en las calles se colocó piedra triturada (mogolla) y se asfaltó con un espesor de dos (2) pulgadas de pavimento debidamente compactado. Se construyeron calles de 13 metros de ancho con cuentones a ambos lados de las calles.

6. Que se radicó un plano de construcción de un puente vado sobre la Quebrada que cruza dos de las fincas y se radicó el permiso en el Departamento de Recursos Naturales, Oficina Regional de Guayama. El proyecto fué visitado por el Técnico de apellido López adscrito al Departamento de Recursos Naturales y dicho Departamento dio el endoso a las obras de construcción sobre la Quebrada que cruza dos de las fincas.

7. Que Frosan Development, Inc. procedió a construir las siguientes facilidades para darle servicio alas 13 fincas y ponerlas a la venta.

a. movimiento de tierra;

b. construcción de calles;

c. construcción de cunetones;

d. construcción de facilidades hidráulicas;

e. construcción de Puente Vado sobre quebrada;

f. construcción de facilidades eléctricas;

8. Que luego de haber construido todas las facilidades antes mencionadas, las fincas fueron puestas a la venta y no se pudieron vender porque eran fincas muy grandes y las personas que estaban interesadas en comprar terrenos, lo que querían eran finquitas de una cuerda o menos.

9. Que se contrató los servicios del señor Alex Báez Rodríguez para que hiciera en la Administración de Reglamentos y Permisos (ARPE) todas las gestiones para lograr la segregación de cada finca en finquitas más pequeñas.

10. Que el señor Báez consiguió que la Oficina Regional de Caguas de la Administración de Reglamentos y Permisos segregara las 13 fincas en finquitas más pequeñas. Debido a que existían facilidades de agua, electricidad, calles y cunetones, la oficina Regional de Caguas autorizó la segregación de cada finca mediante una dispensa de Lotificación Rural. Esta dispensa no requiere que se someta plano de Inscripción y sólo se describe la parcela segregada mediante una descripción geométrica, por lo que no se hizo necesario la preparación de un plano de inscripción como tal.

11. Que el señor Báez me entregó a la mano las dispensas de Lotificación rural debidamente firmadas y selladas por A.R.P.E. y yo se las entregué al Notario que las presentó al Registro de la Propiedad con la copia certificada de la escritura de segregación. Esta escritura, junto con el original de la Dispensa de Lotificación, me fue luego entregada por el Notario debidamente inscrita por el Registrador de la Propiedad, la cual archivé en el expediente de Parque de San Lorenzo. Hice este mismo proceso en las 13 fincas.

12. Que allá para el año 1989, inmediatamente después del paso del Huracán Hugo, me personé al taller y oficina en Juncos donde la corporación guardaba su equipo y expediente, y el expediente de Parque de San 
*1035
Lorenzo junto con unos doscientos (200) expedientes de otros proyectos habían sido arrastrados por las lluvias y los vientos huracanados.

13. Que estoy solicitando del Ledo. Carlos Irizarry copias de las escrituras de segregación para hacerlas llegar al Tribunal, así como cualquier otro documento que formen parte de dichas escrituras.

14. Que mediante la aseveración del Ledo. Santos Marrero Arzuaga, representante legal del señor Príncipe, en su Moción solicitando orden, se está poniendo en duda la existencia de los documentos mediante los cuales se autorizó la segregación de las fincas, por lo que también se pone en tela de juicio la credibilidad de un Honorable Registrador de la Propiedad que vió y tuvo ante sí el original de las Dispensas de Lotificación Rural.

Según mi mejor recuerdo, el Hon. Registrador hizo anotación en las escrituras de que vio la Dispensa de Lotificación Rural y la devolvió.

15. Que estoy disponible para aclarar al Honorable Tribunal toda esta situación.

Y PARA QUE ASI CONSTE, firmo la presente en San Juan, Puerto Rico, hoy día 7 de agosto de 1997.
(Fdo) Enrique Santiago Rodriguez DECLARANTE’
5. El otro "Desarrollador", propietario de la finca donde alegadamente existe la servidumbre en controversia, Alfaro Umpierre, declaró en la silla de testigos, lo siguiente:
Que "no intervino con los trabajos físicos que se hicieron en los solares; ni se le consultó. No tuvo nada que ver con el desarrollo".
El desarrollo lo hizo Frosán Development; no intervenía con la construcción de los accesos, ni con las instalaciones eléctricas, ni con los postes ni con el asfalto, ni con los cortes de terreno; no intervino en nada con el desarrollo de la finca; todo el desarrollo lo hizo Frosán Development.
La comunidad de bienes que existía entre él, su esposa y Frosán, se liquidó en 1989, mediante la escritura número 34 de División de Comunidad de Bienes y Establecimiento de Servidumbre. (Exhibit 3 por estipulación de las partes).
Se le preguntó al testigo, si el intervino con la constitución de una servidumbre de paso por signo aparente Contestó que no. Esa servidumbre se hizo antes de 1989, no sabe fecha, no intervino con ello. Luego declara "Lo mío fue posterior a la división que yo solamente limpiaba ese pedazo que me habían tocado de los solares que tenía ahí, pasaba un tractor con una taladora y eso fue después de 1989".
Se le pregunta al testigo, si sabe si la servidumbre de paso constituida por el mediante la escritura número 34 (exhibit 3 por estipulación) fue inscrita en el Registro de la Propiedad. Contesta que no lo sabe. El testigo admite que firmó la escritura y que fue leída por él. Admite que se le adjudicaron los solares que ahora pertenecen al demandado y al interventor. El abogado le pregunta al testigo si el constituyó la servidumbre de paso sobre dichos solares mediante la escritura número 34. Testigo contesta que esa servidumbre estaba desde que empezó el proyectó ahora, si estaba en escritura o no, no lo sabe. Se le presenta al testigo la escritura número 78, sobre Acta Aclaratoria, de fecha 10 de diciembre de 1990 (exhibit 4 por estipulación que aclara la número 34). Acepta haberla firmado.
Se le pregunta al testigo si cuando el y su esposa y Frosán Development Inc., otorgan la escritura número 34, todavía ellos eran dueños de la finca #9,196. Contesta que no, que ya hacía tiempo se la habían vendido a *1036 Meléndez; que Héctor Meléndez no compareció en dicha transacción y que se sepa, Meléndez tampoco ha otorgado ningún documento autorizando o ratificando esa transacción.
7. Es ilustradora para nuestra determinación la declaración del testigo Ing. Eduardo Lebrón Contreras, quien declaró, en síntesis, que:

“Es Ingeniero mecánico, y que en el 1987 compró un solar en el proyecto de nombre Parque de San Lorenzo en San Lorenzo y que compró específicamente 1 cuerda de terreno. La cuerda está marcada con el solar 4-6. Indica que el señor Passalacqua y el señor Torres eran titulares de dicho sector; los conocí en el momento en que adquirieron los solares.

Menciona que también conoció al señor Héctor de cuyo apellido no se acuerda. Indica que el señor Passalacqua, con relación a su propiedad, estaba localizado, mirando de su solar hacia la carretera, 5 cuerdas hacia el pueblo y que el señor Torres quedaba frente al señor Passalacqua, dos solares más abajo y que el señor Héctor quedaba mirando hacia la carretera del solar, dos solares más arriba a mano derecha frente a su solar. El solar de Héctor pertenece hoy al demandante.

En 1987, cuando compró los solares se encontraban llenos de pastos, la carretera no tenía cunetones, se comunicaron con los desarrolladores para que hicieran los cunetones, porque había mucha erosión en el terreno. Los desarrolladores prepararon unos terrenos al lado derecho del solar del Sr. Príncipe.

Llevaron equipo pesado, lo que se llama puercas y trascavator y prepararon los terrenos allí. Subían por un camino que había en el solar del Sr. Héctor, rompieron terreno hacia adentro para poder llegar a los solares que prepararon al lado derecho; subían el equipo, tuvieron que romper terreno para poder hacer los terraplenes que construían al lado derecho de los terrenos.

En nuestro análisis, detectamos que la alegada servidumbre es efectivamente el camino que se utilizó con el propósito de mover terreno para la preparación de solares y calles del proyecto y que como tal fue un camino temporero, e inherente a la construcción.

8. A lo largo del proceso ante el Tribunal de Primera Instancia, con fecha de 11 de febrero de 1997, el Ledo. Marrero Arzuaga, abogado de los demandantes, presentó una Moción ante el Tribunal de Primera Instancia, donde se solicita en parte:

CUARTO: En la vista celebrada el día 17 de enero de 1997, este Honorable Tribunal, en corte abierta dio instrucciones al abogado aquí suscribiente someter una solicitud y proyecto de orden dirigida al Sr. Plinio Alfaro y al Ing. Enrique Santiago Rodríguez, para que suministren a la parte demandante, a través de su representación legal los siguientes documentos:

“a) Copias certificadas de las resoluciones emitidas por A.R.P.E. autorizando las segregaciones o lotificaciones de los solares 1-11 (finca #14,468), solar 2-11 (finca #14,469), y solar 3-11 (finca #14,492).

b) Copias certificadas por A.R.P.E. de los planos de inscripción aprobados por dicha agencia para cada uno de dichos solares.

c) Copia certificada por A.R.P.E. del plano de desarrollo del Proyecto de Hacienda Parque de San Lorenzo, San Lorenzo, Puerto Rico.

d) Copia de la escritura (o de las escrituras mediante la cual se segregan de la finca# 9,198, los solares 1-11, (finca #14,468); 2-11 (finca #14,469);

*1037 e) Copia de la escritura (o de las escrituras) mediante la cual se segregan de la finca #7,272, el solar núm. 3-11 (finca #14,492)” :
Resulta altamente significativo que el Tribunal de Primera Instancia dictó una ORDEN expresa y directa para que los DES ARROLLADORES, Alfaro Umpierre y Santiago Rodríguez, entregasen lo solicitado:

“ORDEN

Vista la Moción solicitando Orden, radicada por la parte demandante, en la cual indica es esencial para la solución de este caso la producción de documentos enumerados en dicha moción, vistas las declaraciones juradas y suscritas por los señores Enrique Santiago Rodríguez y Plinio Alfaro, mediante las cuales manifiestan ser los desarrolladores del poyecto, y vistos los autos del caso, el tribunal declara la misma HA LUGAR, y SE LE ORDENA a los señores Enrique Santiago Rodríguez y Plinio Alfaro, sin pretexto alguno, suministrar a la parte demandante, a través de su representante legal, Ledo. Santos Marrero Arzuaga, toda la documentación enumerada en la moción solicitando orden dentro del término de 30 días, contados a partir de la fecha del diligenciamiento de esta orden.

Se les apercibe que de no cumplir con lo aquí ordenado, el tribunal podrá declararlos in curso en desacato civil o emitir la disposición que estime conveniente.

Notifíquese.

DADA EN CAGUAS, PUERTO RICO, A 8 DE ABRIL DE 1997.

(Fdo.) Carmen D. Ruiz López

JUEZ SUPERIOR"

Los DESARROLLADORES no cumplieron con la referida ORDEN. El Ingeniero Santiago Rodríguez presentó la declaración jurada que antes transcribimos, en la que indica que, "allá para el año 1989, inmediatamente después del paso del Huracán Hugo, me personé al taller y oficina en Juncos donde la corporación guardaba su equipo y expediente, y el expediente de Parque de San Lorenzo junto con unos doscientos (200) expedientes de otros proyectos habían sido arrastrados por las lluvias y los vientos huracanados."
El problema para el Ingeniero Santiago Rodríguez, y los demandados, con esta estrategia evasiva, es que el Huracán Hugo no arrastró todos los expedientes en las Oficinas Centrales de A.R.P.E., en el Centro Gubernamental Minillas en San Juan, ni en la Oficina Regional de A.R.P.E. en Caguas. Tampoco arrastró Hugo las facilidades del Registro de la Propiedad en Caguas. Definitivamente tenían los recursos para obtener la información solicitada, pero, como veremos, podía poner en dificultades a los "desarrolladores", y se evadió artificiosamente proveer la información.
Más significativo aún resulta, que en la vista del caso en su fondo celebrada en los días 3 y 4 de agosto de del 2000, tres años más tarde, la parte demandada no había producido la información esencial solicitada por la parte demandante.
Y aún hay más. En la vista del caso en su fondo, estando declarando el demandante Rafael Príncipe, se le impidió presentar prueba sobre extremos importantes del caso.
Se intentó presentar una certificación del Registro de la Propiedad sobre la finca 14, 468, propiedad colindante con la suya, la cual pertenece al demandado José L. Benitez Sanchez, y de la finca núm. 14, 469, lo *1038 cual se objetó por "sorpresiva", y el tribunal sostuvo la objeción. La certificación del Registro de la Propiedad es prueba de la verdad, y puede el tribunal cuando desea que la verdad aflore, hasta tomar conocimiento judicial de su contenido.
Príncipe declaró que fue a A.R.P.E. a buscar los planos de la finca núm. 14,469, buscando alguna evidencia de que ante la agencia existía alguna constancia de servidumbre. En el Registro, la finca 14, 469 aparecía con una autorización de A.R.P.E. bajo el Número 81-48-C874 KPL, y el que aparecía en A.R.P.E. era igual, pero con un KPU, y a nombre de otra persona. El abogado del demandado objetó alegando que "no era pertinente al caso". Así también objetó "porque el testigo es testigo de hecho y no un perito". La objeción sobre pertinencia no procedía, porque la prueba es totalmente pertinente, y la objeción sobre no perito, es totalmente errónea, ya que el demandante estaba declarando sobre hechos que le constan de propio y personal conocimiento, y su testimonio a esos efectos es absolutamente admisible. "El Juez dice vamos adelante".
Luego Príncipe leyó la identificación Núm. 5, que le presentó su abogado, una certificación preparada por LA Oficina Regional de A.R.P.E. en relación con el caso núm. 91-48C874 KPL, que indica: (Ident. 5 pte. Demandante).

“CERTIFICACION

Yo, Luisa Suárez Rivera, Subsecretaría de la Oficina Regional de la Administración de Reglamentos y permisos en Caguas, CERTIFICO:

Que no existe evidencia del caso Núm. 81-48-C-874-KPL.

Según Nuestro libro de control existe caso Núm. 81-48-C-874-KPP, P.U. a nombre del Sr. Antonio García Díaz.

Para que así conste, se expide la presente Certificación bajo mi firma y sello oficial de la Administración de Reglamentos y permisos en Caguas, Puerto Rico, hoy DEC. 2 1996.

Luisa Suárez Rivera

Subsecretaría

(SELLO OFICIAL.)”

El abogado del interventor objetó la pertinencia del documento e indica que el demandante está intentando enmendar las alegaciones con la prueba porque en la demanda no se alega que el proyecto no fue a probado por A.R.P.E. Luego, el abogado del demandado objeta porque “no se han sentado las bases para establecer que ese documento tiene un vínculo con la propiedad del demandante. ”
El tribunal sugiere posponer la determinación de la pertinencia del documento hasta que el perito declare sobre lo de A.R.P.E.
El tribunal incidió, pues, la pertinencia era obvia, la determinación nunca se efectuó, y el posible fraude quedó encubierto.
Príncipe declara que al igual que con la finca del demandado, hizo la misma gestión con la finca del interventor. La finca del demandado y del interventor aparece en el Registro de la Propiedad con el mismo número de A.R.P.E. lo cual investigó con la misma persona y dio también una certificación de que ese número no existía. Solicitó otra certificación a A.R.P.E. Se le muestra al testigo la identificación número 4 de la parte demandante.

*1039
“CERTIFICACION

Yo, Ruth Felicié López, en mi carácter de Secretaria de la Oficina de Secretaría de la Administración de Reglamentos y Permisos, procedo a emitir la siguiente Certificación:

"Que se ha realizado una búsqueda en los mapas de Zonificación del Archivo Gráfico y en los cuadrángulos del Municipio de San Lorenzo, en la Carretera 181, Km. 31.4 del Barrio Quebrada San Lorenzo, número 37C; y hasta el momento no hay evidencia de radicación de Desarrollo para Urbanización Parque de San Lorenzo."

Para que así conste, se expide la presente certificación bajo mi firma y sello oficial de la Administración de Reglamentos y Permisos, hoy día 7 de febrero de 1997.

Ruth Felicié López

Secretaria

Oficina de Secretaría

(SELLO OFICIAL)”

El abogado del interventor reproduce la misma objeción que para el documento anterior. El tribunal sugiere que se posponga la determinación de pertinencia hasta que el perito declare lo de A.R.P.E. No hacía falta perito para establecer la pertinencia de este documento, pero el tribunal nunca resolvió sobre la pertinencia de la prueba para demostrar la ilegalidad del proceso por el cual los "desarrolladores" lograron lotificar una finca en setenta y seis (76) solares, proyecto extenso, sin una hoja de permiso de la Junta de Planificación, ni de A.R.P.E.
Príncipe declaró que fue al Municipio de San Lorenzo, para ver si podía conseguir mapas en los archivos. Allí le expidieron una certificación, y la leyó para récord. (Identificación 3, parte demandante)

“CERTIFICACION

Yo, Pedro Santiago Alverio del Municipio de San Lorenzo, en mi carácter de administrador Municipal, procedo a emitir la siguiente Certificación:

Que se ha realizado una búsqueda en nuestros archivos y en los cuadrángulos del Municipio de San Lorenzo, en la Carretera 181, Km. 31.4 del Barrio Quebrada en San Lorenzo, número 370; y hasta este momento no hay evidencia de radicación de desarrollo para Urbanización Parque de San Lorenzo.

Para que así conste, se expide la presente certificación bajo mi firma y Sello Oficial del Municipio de San Lorenzo, hoy 24 de marzo de 1999.

Pedro Santiago Alverio

SELLO OFICIAL”

El abogado del demandado objeta el documento por las mismas razones que los documentos previos. Además, objeta porque se está tratando de enmendar la demanda por las alegaciones y porque el documento no guarda pertinencia a la controversia en particular. El abogado del interventor objeta porque para la época en que se hizo el desarrollo no había que solicitar el endoso del municipio. El Tribunal dice ese hecho que habría que aclararlo con el ingeniero también. El abogado del demandante alega que toda esa documentación relacionada con las segregaciones de las fincas del demandado e interventor le fueron solicitadas a la parte demandada y éstos no produjeron la misma alegando que no tenían esos documentos, lo que motivó a petición del demandante una *1040 orden del tribunal dirigida al desarrollador Enrique Santiago y a Plinio Alfaro, para que sometieran los documentos y al día de la vista no lo habían sometido.
Príncipe declaró su finca es un remanente de la finca número 9,196, y que las finca 14, 468 y 14,469 salen de la finca 9,198. Declaró que el 18 de julio de 2000, fue al Registro de la Propiedad y examinó las fincas del demandado y del interventor. Indicó que la finca 14,468 hacía dos días figuraba inscrita a nombre del Sra. Plinio Alfaro y la Finca 14,469 figura a nombre del interventor Samuel González.
El Tribunal de Primera Instancia incidió al ignorar una situación que clamaba porque se atendiera, como parte del ejercicio judicial de que se haga cumplida justicia. Nos referimos a una cuestión de política pública que los que tenemos la honrosa encomienda de hacer justicia, tenemos la obligación de hacer que se cumpla, y son las leyes y los reglamentos que rigen el desarrollo de los proyectos de vivienda, tanto en la zona urbana como en la zona rural. Nuestra función no puede ser una de meros espectadores ante la controversia, tenemos que ser vigilantes a beneficio de la población en general.
Como discutimos más adelante, el Tribunal de Primera Instancia tenía ante sí una controversia surgida sobre una alegada servidumbre, en una desarrollo clandestino de setenta y seis (76) solares, desarrollo que se efectuó sin cumplir en forma alguna con las normas de la Junta de Planificación, creada en virtud de la Ley Núm. 213 de 12 de mayo de 1942, según ésta ha sido enmendada, y los Reglamentos aprobados bajo dicha Ley, ni tampoco se ha cumplido con la Ley que creó la Administración de Reglamentos y Permisos (A.R.P.E.), Ley Núm. 76 de 24 de junio de 1975, según ha sido ésta enmendada.
De entrada, señalamos que nuestro dictamen judicial se funda en tres premisas, una, que lo declarado como servidumbre por el Tribunal de Primera Instancia, no llegó nunca al rango de servidumbre, sino un trillo utilizado para mover terreno de la parte más alta de la finca en camiones, para rellenar terreno para calles y otros solares, dos, que aun asumiendo que llegase al rango de servidumbre, la misma era una figura natimuerta al confeccionarse los solares del desarrollo ilegal, que fueron vendidos a los eventuales compradores, y tres, aun cuando se valide posteriormente el desarrollo por A.R.P.E., el Reglamento de Lotificación (Reglamento de Planificación Núm. 3), aprobado en 1954, y vigente aún en el 1984, año en que el Agrimensor Daniel Gómez Marrero confeccionó el "Plano Maestro del Proyecto Parque de San Lorenzo", prohibía y no permitía la segregación de solares mediante servidumbres. El Artículo 73 del referido Reglamento, indica:
“ARTICULO 73.- Lotificaciones de Carácter Rural. - En los casos de lotificaciones de carácter rural que estén situadas fuera de las áreas hasta donde se extiende la planificación metropolitana o urbana, la Junta podrá, hasta el grado en que lo considere permisible en cada caso, exceptuar tales lotificaciones de las disposiciones sobre construcción de obras de urbanización contenidas en el presente Reglamento, requiriendo, en su lugar, las mejoras rústicas que estimare necesarias. ”
En ningún caso aprobará la Junta una lotificación de carácter rural sin la provisión de, por lo menos, una servidumbre de paso real y permanente que sirva de acceso para la misma y para cada uno de los nuevos predios.
II. El derecho aplicable y su análisis.
A. Las servidumbres en general.
Las servidumbres no se presumen, sino que hay que probar su constitución. Ibáñez v. Tribunal Superior, 102 D.P.R. 615 (1974).
Nuestro Código Civil, en su Art. 465, (31 L.P.R.A. sec. 1631), define la servidumbre como aquel gravamen impuesto sobre un inmueble en beneficio de otro perteneciente a distinto dueño. El inmueble a cuyo favor está *1041 constituida la servidumbre se denomina predio dominante; el que la sufre, predio sirviente. Las servidumbre pueden adquirirse: (1) por ley, (2) por título, (3) por prescripción, (4) por signo aparente. Diaz v. Titulares Condominio El Monte, N. Garden, 132 D.P.R. 452, 459 (1993).
En el caso particular de la servidumbre de paso, la norma general, según establecida por el Art. 475 del Código Civil, es que la misma se adquiere en virtud de título, ya que por ser discontinuas, no es susceptible de adquirirse mediante prescripción. No obstante, la servidumbre que se constituye mediante signo aparente está exceptuada de este requisito. Sociedad de Gananciales v. Sec. de Justicia, 137 D.P.R. _ (1994) 94 J.T.S. 124; Díaz v. Consejo de Titulares, supra. También lo está la servidumbre que se adquiere desde el uso de tiempo inmemorial. Figueroa v. Guerra, 69 D.P.R. 607 (1949).
Con relación a este último modo de adquirir, una servidumbre según el Art. 477 del Código Civil, supra, lee como sigue:

"La existencia de un signo aparente de servidumbre entre dos fincas establecido por el propietario de ambas, se considerará, si se enajenare una como título para que la servidumbre continúe activa y pasivamente, a no ser que, al tiempo de separarse la propiedad de las dos fincas, se exprese lo contrario en el Título de enajenación de cualquiera de ellas, o se haga desaparecer aquel signo antes del otorgamiento de la escritura."

Al respecto, el Tribunal Supremo de Puerto Rico, interpretando el Art. 477 del Código Civil, ha identificado los cuatro requisitos que surgen de esta norma que son los siguientes:

“1. La existencia de un signo aparente entre dos fincas.

2. Que el signo aparente de servidumbre lo haya constituido el dueño en ambas fincas.

3. Que una de las fincas sea enajenada.

4. Que no se haya hecho desaparecer el signo aparente de servidumbre antes del otorgamiento de la escritura de enajenación o que no se haya hecho una manifestación contraria a la subsistencia del mismo en el título de enajenación de cualquiera de las fincas. ” Díaz v. Consejo de Titulares, supra.
No obstante, la norma jurisprudencial ha establecido que el signo ha de ser ostensible e indubitado, permanente, no variable ni accidental. Díaz, supra. Este requisito es necesario no sólo cuando el propietario original de dos fincas establece una servidumbre de paso sobre una de ellas, sino también cuando sobre una finca poseída por un sólo dueño, éste ha constituido un signo aparente el cual, al venderse parte de la finca, se convierte en servidumbre, quedando así un predio dominante y un predio sirviente. Por ello, la situación de hechos que hace posible el nacimiento de la servidumbre la establece el dueño antes de la venta. Ibáñez, supra.
Lo anterior es una excepción a la norma general de que para que una servidumbre surta efecto contra un tercer poseedor es preciso que conste inscrito en el Registro de la propiedad el título constitutivo de aquélla. Lo que ocurre es que cuando los signos de la servidumbre son ostensibles o indubitados, su apariencia exterior le supone una publicidad equivalente a la de la inscripción; por lo tanto, surten efecto contra el adquirente del inmueble, aunque no resulte del registro la existencia de la servidumbre. La constitución de la servidumbre por signo aparente es también una excepción a los términos del Art. 475 del Código Civil, el cual establece que el signo aparente se considerará como título en las circunstancias allí expresadas. Ibáñez, supra.
Así también, el propietario de una finca enclavada entre otras ajenas y sin salida a camino público, tiene derecho a exigir paso por las heredades vecinas, previa la correspondiente indemnización. Sin embargo, el hecho de que una finca tenga acceso a vía pública no excluye la posibilidad de que ésta adquiera una servidumbre de *1042 paso por signo aparente.
Se ha sostenido que partiendo de la premisa de que el interés que satisface la servidumbre puede ser de cualquier clase: económico, de comodidad, estético, de necesidad, o de utilidad, si existe un signo aparente de la servidumbre de paso, ésta surgirá no empece a que el predio beneficiado ya tenga acceso a camino público sea éste directo o en virtud de otra servidumbre. Díaz, supra.
La mera existencia de veredas, trillos, o caminos irregulares no pueden constituir un signo aparente; y que el mero permiso del propietario, o su tolerancia de paso, no son suficientes para establecer la servidumbre. Díaz, supra; Ibáñez, supra; Goenaga v. Oneill de Millán, 85 D.P.R. 170 (1962); Martín v. Correa, 76 D.P.R. 12 (1954); Pabón v. Ayala, 71 D.P.R. 938 (1950); Figueroa v. Guerra, supra; Cabanillas v. Gelpí, 65 D.P.R. 945 (1937).
Bajo el Art. 477, puede darse la situación en la que el signo aparente sea constituido por el propietario anterior al que enajena; en tal caso, la conservación del signo revela la ratificación y voluntad de dar vida a la servidumbre. Díaz, supra; Sociedad de Gananciales v. Municipio de Aguada, 144 D.P.R. 114 (1997).
El establecimiento del signo equivale a la conservación por el propietario que enajena, aunque fuera puesto por otro propietario anterior. Por ello, el Art. 477 dispone como situación excluyente de la constitución de servidumbre que el signo se haga desaparecer. El hecho de conservarlo equivale a su establecimiento.
Resulta imperativo señalar lo obvio, ya que sobre todo lo dicho en relación con la servidumbre establecida por signo aparente, gravitan dos requisitos que emanan de la ley, y el orden publico.
El primero es que la alegada servidumbre por signo aparente surja de una actuación legal; si la servidumbre está revestida de ilegalidad, es nula por virtud del Articulo 4 de Código Civil de Puerto Rico, el cual dispone que; "son nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez". 31 L.P.R.A. sec. 4.
El segundo es que la alegada servidumbre de paso, como toda servidumbre, sostenga su necesidad, pues si dejase de ser necesaria, pierde su eficacia jurídica y deja de ser servidumbre.
A continuación cubrimos esos dos aspectos que se encuentran ausentes en la alegada servidumbre en el caso que nos ocupa, a saber su legalidad y su necesidad.
B. La ilegalidad de la alegada servidumbre.
i.
A continuación exponemos las leyes que rigen las lotificaciones de terrenos en Puerto Rico.
Nos remontamos al año 1942, cuando mediante la Ley Núm. 213 de 12 de mayo de 1942, se crea la Junta de Planificación de Puerto Rico, presidida por don Rafael Picó, y en su Art. 24 estableció:

“A partir de la fecha de vigencia de los reglamentos aplicables para lotificaciones según se dispone en la sec. 10 de este título, no se hará en Puerto Rico ninguna lotificación de terrenos y no se aceptará para registrarlo ningún plano de lotificación de terrenos,, ni se levantará ni se permitirá que se levante ningún edificio, ni se llevará a efecto acto o transacción alguna de las que define la see. 2 de este título, ni se expedirá ningún permiso, excepto cuando y hasta donde, se cumplan dichos reglamentos y hayan sido finalmente aprobados de acuerdo con los mismos por la Junta. Disponiéndose, sin embargo, que la Junta, a su discreción, podrá aprobar la venta o arrendamiento de terreno en lotificaciones sólo después de su aprobación preliminar por la Junta, para hacer lo cual ésta queda por la presente autorizada. Excepto cuando lo autorice el solicitante, a menos que la Junta 
*1043
desapruebe un plano final de lotificación (plano de inscripción), dentro de un plazo de sesenta (60) días de haberse sometido, se considerará que dicho plano final de inscripción ha sido aprobado. Por la presente se crea un Registro de Planos de Lotificación, el cual estará a cargo de los respectivos registradores de la propiedad. Los planos finales de lotificación que apruebe la Junta se inscribirán en dicho registro, en el distrito o distritos donde radiquen los terrenos. El Secretario de Justicia emitirá reglamentos adecuados para dichas inscripciones, y dispondrá los derechos que han de ser cobrados por las mismas.

Toda persona que infrinja esta sección incurrirá en delito menos grave, y convicta que fuere, pagará una multa no menor de veinticinco (25) dólares, ni mayor de trescientos (300) dólares, y una multa adicional por la misma cantidad por cada edificio, o estructura construida o mantenida o que se permita construir o mantener, o por cada solar, predio, parcela, o interés en los mismos de ese modo traspasados, vendidos, o arrendados, o convenido en vender o arrendar. Por cada día y durante todos los días que subsista dicha violación, se considerará un delito separado cometido.

El término de prescripción de dicha infracción será de cinco (5) años. El Secretario de Justicia, cualquier policía o cualquier funcionario de la Junta de Planificación de Puerto Rico, a nombre del Estado Libre Asociado de Puerto Rico, podrá formular la correspondiente denuncia y a solicitud de la Junta el Secretario de Justicia deberá impedir tal violación mediante recurso de interdicto o mediante cualquier otro procedimiento en cualquier corte de jurisdicción competente. Ningún registrador aceptará para inscribirlo, ningún plano de lotificación que no haya sido finalmente aprobado y firmado por la Junta, ni ningún traspaso, convenio de traspaso, de una parcela de terreno, ni interés en la misma, dentro de una lotificación, a menos que se haya registrado un plano final o preliminar aprobado por la Junta.

Carecerá de eficacia cualquier otorgamiento de escritura pública o contrato privado de lotificación si no ha sido sometida previamente dicha lotificación a la consideración de la Junta de Planificación de Puerto Rico y de haber sido aprobada por ésta, excepto en aquellos casos en que lo permita el Reglamento de Lotificación. -Mayo 12, 1942, Núm. 213.”

Desde 1942, este estatuto contenía la política pública establecida por la Asamblea Legislativa.
Véase que el estatuto (1) fija una penalidad de $25 a $300 dólares por cada infracción y que cada día que dicha infracción prevalezca, se considerará un delito separado; (2) Instruye al Secretario de Justicia, a cualquier policía o cualquier funcionario de la Junta de Planificación a formular la denuncia; (3) La Junta puede pedir al Secretario de Justicia que utilice el recurso de interdicto, o cualquier otro necesario, para hacer cumplir el Reglamento.
El estatuto además prohíbe a los Registradores de la Propiedad aceptar para inscribir ningún plano que no haya sido finalmente aprobado y firmado por la Junta, ni ningún traspaso, convenio de traspaso, de una parcela de terreno, ni interés en la misma, dentro de una lotificación, a menos que se haya registrado un plano final o preliminar aprobado por la Junta.
Finalmente señala que "carecerá de eficacia cualquier otorgamiento de escritura pública o contrato privado de lotificación si no ha sido sometida previamente dicha lotificación a la consideración de la Junta de Planificación de Puerto Rico y de haber sido aprobada por ésta".
Al crearse la Administración de Reglamentos y permisos en 1975, la reglamentación sobre lotificaciones de terreno se delegó en esta entidad y quedó plasmada en esta forma:

“A partir de la fecha de vigencia de los reglamentos aplicables para lotificaciones según se dispone en este Capítulo y en las sees. 62 a 63j de este título, no se hará en Puerto Rico ninguna lotificación de terrenos ni se 
*1044
aceptará para registrar ningún plano de lotificación de terrenos, ni se llevará a efecto acto o transacción alguna de las que define la sec. 71b de este título, ni se expedirá ningún permiso, excepto cuando y hasta donde, se cumpla con las recomendaciones relativas al Plan de Desarrollo Integral, los Planes de Uso de Terrenos, el Programa de Inversiones de Cuatro Años y con los reglamentos aplicables y han sido finalmente aprobados de acuerdo con los mismos por la Administración. Se crea un Registro de Planos de Lotificación, el cual estará a cargo de los respectivos registradores de la propiedad. Los planos finales de lotificación que apruebe la Administración de Reglamentos y Permisos se inscribirán en dicho registro, en el distrito o distritos donde radiquen los terrenos. El Secretario de Justicia de Puerto Rico emitirá reglamentos adecuados para dichas inscripciones.

Toda persona que infrinja esta sección incurrirá en delito menos grave, y convicta que fuere, pagará una multa no menor de veinticinco (25) dólares, ni mayor de quinientos (500) dólares, y una multa adicional por la misma cantidad por cada edificio, o estructura construida o mantenida o que permita construir o mantener, o por cada solar, predio, parcela, o interés en los mismos de ese medio traspasados, vendidos, o arrendados, o convenido en vender o arrendar. Por cada día y durante todos los días que subsista dicha violación, hasta un máximo de diez (10) días consecutivos se considerará un delito separado cometido. El término de prescripción de dicha infracción será de cinco (5) años.

El Secretario de Justicia de Puerto Rico, cualquier policía o cualquier funcionario de la Administración de Reglamentos y Permisos, a nombre del Pueblo de Puerto Rico, podrá formular la correspondiente denuncia y a solicitud de la Administración de Reglamentos y Permisos, el Secretario de Justicia deberá impedir tal violación mediante recurso de interdicto o mediante cualquier otro procedimiento en cualquier tribunal de jurisdicción competente. Ningún registrador aceptará para inscribir, ningún plano de lotificación que no haya sido finalmente aprobado y firmado por el Administrador de Reglamentos y Permisos, ningún traspaso, convenio de traspaso de una parcela de terreno, ni interés en la misma, dentro de una lotificación, a menos que se haya registrado un plano final o preliminar aprobado por la Administración de Reglamentos y Permisos.

Carecerá de eficacia cualquier otorgamiento de escritura pública o contrato privado de lotificación si no ha sido sometida previamente dicha lotificación a la consideración de la Administración de Reglamentos y Permisos y no ha sido aprobada por ésta, excepto en aquellos casos en que lo permita el Reglamento de Lotificación; Disponiéndose, que cualquier otorgamiento por medio de escritura pública o contrato privado en el cual se haga una lotificación sin haber sido previamente sometida y aprobada por la Administración de Reglamentos y permisos, cuando ello fuere necesario, quedará ratificado y convalidado si, con posterioridad a dicho otorgamiento, la Administración de Reglamentos y Permisos aprobare, mediante resolución, la lotificación objeto de la escritura o contrato privado.

Esta última disposición no se interpretará en el sentido de permitir la inscripción con defecto subsanable en el Registro de la Propiedad de aquellos títulos que no estén acompañados de la resolución de la Administración de Reglamentos y Permisos aprobando, verificando o convalidando la lotificación. -Junio 24, 1975, Núm. 76, p. 233, art. 22, ef. Julio 1,1975. ”

Este estatuto está vigente al día de hoy, y rige todas las transacciones a partir del año 1975, por lo que rige todas las transacciones que se han realizado en el presente caso, desde la compra de la finca de 65 cuerdas por don Plinio Alfaro Umpierre a la Sra. Vda. de Palés, allá para el 1983, según la sentencia del tribunal apelado.
Toda la prueba de la parte demandante que fuera dirigida a poner en duda la legalidad de las transacciones en el proyecto es prueba pertinente a la controversia, como veremos al discutir la inexistencia de la servidumbre. El Foro de Instancia incidió al impedir la presentación de, y al descartar la prueba ofrecida por Príncipe, para atacar la legalidad de las actuaciones de los "Desarrolladores", al emitir su sentencia.
*1045 ii.
Basta observar el plano de lotificación del desarrollo Haciendas Parque de San Lorenzo, Exhibit X, el "Plano Maestro del Proyecto Parque de San Lorenzo", confeccionado por el Agrimensor Gabriel Gómez Marrero en junio de 1984 el cual contiene la distribución del terreno de 65 cuerdas en 76 solares, y se apreciará que es idéntico al Exhibit IX con dos excepciones, primero el Exhibit IX no tiene firma y sello del Agrimensor, y segundo no contiene dibujado en línea entrecortada la alegada servidumbre de diez metros que atraviesa cuatro solares.
Al observar la fotografía aérea ampliada que corresponde a un vuelo aéreo del año 1990 (Exhibit 4, pte. demandada), vemos que en toda la parte que cubren los solares en controversia, la única construcción que existía para 1990 era la residencia que construyó don Héctor Meléndez y que luego vende al demandante Príncipe, y se puede apreciar que la alegada servidumbre es un camino que nace en la parte más alta del terreno y discurre hacia la vía principal o real. Claro, al confeccionar el plano, el agrimensor obvia esto y termina la alegada servidumbre abruptamente en el cuarto solar. La tal servidumbre no se corta en el cuarto solar, como aparece en el plano preparado por Gómez Marrero. El camino llega hasta una especie de cantera en la parte alta de la finca.
En su testimonio, Gómez Marrero declaró que para la fecha de 1984, ya estaba el camino y se utilizaba por el proyectista para remover terreno de los últimos solares para hacer las calles del proyecto y que esto le constaba de propio y personal conocimiento. (Exposición narrativa p. 9)
Cuando se le preguntó por el abogado del demandado, "la razón de porqué en un plano aparece dibujada esa servidumbre y en el otro no, contesta el testigo que fue un error de su parte cuando hizo el plano maestro, no trazó el camino en el plano que está en la copia de azul y entonces inmediatamente el ingeniero Santiago se da cuenta, lo llamó y le dijo que había un error que no marcó el camino en el plano. Entonces, él hizo en ese mismo mes el plano como era, con el camino de acceso hacia esas parcelas".
Es fundamental tomar en cuenta que para el 1990, las tales parcelas no existían. Véase que el abogado habla siempre de "servidumbre", pero Gómez Marrero habla de "camino", no de servidumbre.
En su testimonio, don Eduardo Lebrón Contreras declaró que "llevaron equipo pesado, lo que se llama puercas y transcavator y prepararon los terrenos allí. Subían por el camino que había en el solar del Sr. Héctor, rompieron terreno hacia adentro para poder llegar a los solares que prepararon al lado derecho, subían el equipo, tuvieron que romper terreno para poder hacer los terraplenes que construían al lado derecho de los terrenos". (Exp. Narra, p. 4)
El "desarrollador", Don Plinio Alfaro Umpierre, al declarar se le preguntó si intervino en la constitución de una servidumbre de paso por signo aparente en ese desarrollo y su contestación fue un No. Luego dijo que esa servidumbre se hizo antes de 1989, no sabe la fecha, no intervino con ello. Se le preguntó si cuando él y su esposa, y Frosan Development otorgaron la escritura número 34, todavía ellos eran dueños de la finca 9,196 y contestó que no, que ya hacía tiempo se la habían vendido a Meléndez, que Héctor Meléndez no compareció en dicha transacción y que él sepa, Meléndez tampoco ha otorgado ningún documento autorizando o ratificando esa transacción. Esto es muy importante. Definitivamente, la alegada servidumbre no se constituyó por título.
La escritura número 34 de 5 de junio de 1989, se otorga para hacer dos cosas, para liquidar la comunidad de bienes constituida por don Plinio Alfaro y su esposa, con el Ingeniero Santiago Rodríguez, y para tratar de otorgarle título de servidumbre al camino existente para bajar relleno de la parte alta para rellenar solares y calles en el desarrollo.
Del testimonio de don Plinio surgen dos premisas: primero que él no tuvo nada que ver con la constitución de la "servidumbre", y segundo que cuando se le pone a firmar el documento para liquidar la comunidad de bienes *1046 entre él y su esposa, ya antes se le había vendido la finca #9,196 a don Héctor Meléndez.
Obviamente el camino para pasar los tractores, las palas mecánicas llamadas "puercas" y los camiones para extraer terreno, tenía ese uso. El camino se estableció para cubrir una necesidad, y al terminar la obra de relleno perdió su razón de existir.
El perder su razón de existir, no fue nunca una servidumbre, pues se trataba de un trillo en la finca de una persona, no tenía el carácter de ostensible e indubitado, y no había predio dominante ni predio sirviente. Veamos textualmente la posición del Tribunal Supremo a esos efectos.
(7-8) Es debido a las repercusiones que una servidumbre constituida por signo aparente tiene en el tráfico jurídico de los bienes inmuebles que nuestra jurisprudencia reiteradamente ha señalado que el signo mismo ha de ser ostensible e indubitado, Ibáñez v. Tribunal Superior, supra, pag. 627, permanente, no variable ni accidental. Delgado Cruz v. Girau Bernal, 115 D.P.R. 61, 66-67 (1984); Goenaga v. O’neill de Milan, 85 D.P.R. 170, 216 (1962). En cuanto al signo aparente que un camino o trillo pueda sugerir, en Goenaga v. O’neill de Milan, supra, indicamos que la mera existencia de veredas, trillos o caminos irregulares no equivale a un signo aparente de servidumbre de paso. Tampoco queda constituida dicha servidumbre por la mera tolerancia de dicho paso. Ibáñez v. Tribunal Superior, supra; Goenaga v. O’neill de Milan, supra, pág. 203. En Logia Caballeros del Sur v. Cordero, 74 D.P.R. 444, 448 (1953), expresamos, a iguales efectos, que debían "existir algunas manifestaciones físicas de la servidumbre, tales como un pasadizo nivelado de brea o cemento, un callejón claramente trazado o algunos otros signos visibles de la servidumbre".
iii.
Los "Desarrolladores", Santiago Rodríguez, en su declaración jurada ante el Tribunal de Primera Instancia y Alfaro Umpierre, a través de sus actos, pretendieron obviar los requisitos que por ley tenían que seguir, y alegadamente condujeron el proyecto como uno de lotificación simple. Ello fue ilegal.
El Reglamento de Planificación Número 3, fue aprobado en 26 de marzo de 1954, y entró en vigor en 26 de abril de 1954, siendo don Luis Muñoz Marín Gobernador, y N. Almiroty, Secretario de Estado. Dicho Reglamento ha sufrido algunas enmiendas a través de los años, pero en 1984, en que Gómez Marrero prepara el gran Plano Maestro, así como en 1987, cuando los desarrolladores le venden la finca Num. 9,196 a don Héctor Meléndez, los Artículos del Reglamento que citamos, estaban en vigor.
El Artículo 3, enmendado en 16 de octubre de 1974, establecía que para fines agrícolas se permitía que se segregasen en la zona rural fincas de 25 cuerdas, siempre que el remanente resultara con cabida de 25 cuerdas.
ARTICULO 3. - Exenciones para la Zona Rural. - Quedan exentas de las disposiciones de este Reglamento las lotificaciones de fincas en la zona rural, para fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas resulte ser de veinticinco (25) cuerdas o mayor. Esta disposición no aplica a las lotificaciones situadas en áreas en que la Junta determine, mediante resolución, que las posibilidades de extensión urbana así lo exigen.
Dicho Reglamento, en su Artículo 4 contiene la obligación de presentar ante la Junta de Planificación, una Declaración de Intención de Lotificar.
ARTICULO 4.- Declaración de Intención de Lotificar.- Cualquier persona natural o jurídica interesada en realizar una lotificación, llenará primeramente una Declaración de Intención de Lotificar en el impreso dispuesto por la Junta, y la presentará ante el Secretario de la Junta quien, de contener la misma toda la documentación e información mínima requerida por este Reglamento, procederá a su radicación. El Secretario de la Junta devolverá sin radicar cualquier Declaración de Intención de Lotificar que no incluya todos los documentos e *1047 información requeridos.
El Ingeniero Santiago Rodríguez no nos ofrece constancia de que se cumpliera con esto.
El Artículo 5 se expresa del mismo modo que se expresa el Artículo 3, pero adiciona:
El Registrador de la Propiedad, antes de aceptar estas lotificaciones para registrarlas, requerirá de la parte interesada la certificación expedida al efecto por la Junta.
El Artículo 6 dispensa de la presentación de planos de construcción, cuando se trata de una lotificación de carácter simple, pero definitivamente no queda eximida de dicho requisito, un desarrollo extenso de (76) solares.
ARTICULO 6. Dispensa de Planos de Construcción. - Cuando la Declaración de Intención de Lotificar se desprenda que se trata de una lotificación de carácter simple, esto es, cuando ya estén construidas todas las obras de urbanización, y aun en aquellos casos en que dichas obras resulten ser muy sencillas, la Junta podrá decidir que los Planos de Construcción que más adelante se exigen no son necesarios, y expresamente dispensar tal lotificación de cumplir con el requisito de su presentación.
No obstante, en tales casos se requerirán Planos de Inscripción, los que se ajustarán a todos los requisitos prescritos en el Título VIII que resulten aplicables.
Cuando se trata de un desarrollo de la naturaleza de Parque de San Lorenzo, veamos lo que dice el artículo 8:
ARTICULO 8. - Datos a Someterse en Casos que Incluyan Urbanización. - Cuando la lotificación incluya calles y otras obras de urbanización, la Declaración de Intención de Lotificar se acompañará de una descripción general o croquis que indique la idea general o cualesquiera propósitos particulares que, para su desarrollo, pudiera tener el urbanizador. Esta información tiene por propósito el de facilitar a la Junta la preparación o revisión de un Desarrollo Preliminar para la lotificación, según requerido en el Artículo 9.
En estos casos, la Declaración de Intención de Lotificar también se acompañará de un plano de mensura de la parcela a lotificarse, en escala 1:2000, el cual incluirá, además, de los datos técnicos de la mensura, los colindantes, la localización de las vías públicas limítrofes y la topografía del terreno, con curvas de nivel a equidistancia ("contour inverval") no mayor de un (1) metro.
Definitivamente no se cumplió con este requisito en Parque de San Lorenzo. Según la declaración jurada de Santiago Rodríguez, lo que hicieron fue dividir cada una de las trece (13) parcelas de cinco (5) cuerdas como si fuera una lotificación simple, ya que el había establecido facilidades para las trece (13) parcelas.
Entonces, Santiago Rodríguez hizo lo que expuso en su declaración jurada, incluyendo el que había sometido los planos al Municipio de San Lorenzo, y allí certifican que tal desarrollo no existe para el Municipio.
Además declaró bajo juramento por escrito ante el tribunal, lo siguiente:

“Que se contrató los servicios del señor Alex Báez Rodríguez para que hiciera en la Administración de Reglamentos y Permisos (ARPE) todas las gestiones para lograr la segregación de cada finca enfinquitas más pequeñas.

Que el señor Báez consiguió que la Oficina Regional de Caguas de la Administración de Reglamentos y Permisos segregara las 13 fincas en finquitas más pequeñas. Debido a que existían facilidades de agua, electricidad, calles y cunetones, la Oficina Regional de Caguas autorizó la segregación de cada finca mediante 
*1048
una dispensa de Lotificación Rural. Esta dispensa no requiere que se someta plano de Inscripción y sólo se describe la parcela segregada mediante una descripción geométrica, por lo que no se hizo necesario la preparación de un plano de inscripción como tal. ”

El tal Alex Báez no declaró en la vista del caso y allí no se presentó prueba alguna de lo aseverado por el Ingeniero Santiago Rodríguez.
Cuando en 1984, Gómez Marrero el Agrimensor fue contratado para hacer el "Plano Maestro del Proyecto Parque de San Lorenzo", que consiste nada menos que de setenta y seis (76) solares, o sea que es un Proyecto Extenso, y según su propio testimonio se le olvidó indicar en el plano el camino que parte del solar del demandante y termina en el cuarto solar subiendo, lo cual no corresponde a la fotografía aérea ampliada sometida en evidencia por los demandados. La verdad es que el plano jamás podía tener acceso a la Junta de Planificación ni a A.R.P.E., porque todas y cada una de las fincas tenían que tener acceso a un camino real, público, o de lo contrario no sería aprobado.
En el Reglamento de Lotificación Núm. 3, reza el Artículo 73.- Lotificaciones de Carácter Rural:

“En los casos de lotificaciones de carácter rural que estén situadas fuera de las áreas hasta donde se extiende la zona de planificación metropolitana o urbana, la junta podrá, hasta el grado que lo considere permisible en cada caso, exceptuar tales lotificaciones de las disposiciones sobre construcción de obras de urbanización contenidas en el presente Reglamento, requiriendo en su lugar, las mejoras rusticas que estime necesarias. En ningún caso aprobará la Junta una lotificación de carácter rural sin la provisión de, por lo menos, una servidumbre de paso real y permanente que sirva de paso para la misma y para cada uno de los nuevos predios. ”

Por sus actos, cuando los desarrolladores contrataron la preparación de planos para el desarrollo de Parque de San Lorenzo, fuera éste uno simple o uno extenso, no podían depender de una servidumbre para dar acceso a una vía pública a cada uno de los solares del desarrollo. Lo hecho fue un acto ilegal, las ventas de solares a los demandados y a los interventores fueron actos ilegales de los desarrolladores, y es contra los desarrolladores que tienen que acudir los demandados e interventores, a exigirles facilidades para salir cómodamente a un camino público.
C. La servidumbre no era necesaria.
La doctrina sobre servidumbres reconoce como principio fundamental de las servidumbres, su utilidad y necesidad. Cuando una servidumbre deja de ser útil, el propietario del predio sirviente tiene derecho a pedir su extinción.
El propósito de crear ficticiamente una servidumbre, convirtiendo un camino creado para servir una cantera de tierra y piedra con carácter temporero, fue para evitar los "desarrolladores" el tener que facilitar el acceso a la calle real a tres de los solares que vendieron.
Sin duda, estos desarrolladores le hicieron la representación a los compradores de que aquel camino temporero era una servidumbre. De hecho quisieron crear una servidumbre por título, pero luego de haber vendido el último solar en la cadena a don Héctor Meléndez.
De la fotografía aérea y las fotografías sometidas como prueba por los demandados e interventores, resulta evidente que el solar de Benitez Sánchez tiene un fácil acceso a la calle principal del desarrollo Parque de San Lorenzo. Siendo ello así, ¿qué necesidad tiene Benitez Sánchez de insistir en atravesar el fundo de Príncipe cuando tiene un fácil acceso a la calle pública?
*1049 Toda vez que tanto el demandado José L. Benitez Sánchez, como el interventor Samuel González González afirman que la servidumbre existe, Benitez puede gentilmente ceder acceso a González a través de su fundo, al camino público, por el lugar menos oneroso para Benitez, previo el pago de alguna compensación por González.
SENTENCIA
Por los fundamentos expuestos, se dicta sentencia para revocar la dictada por el Tribunal de Primera Instancia, Sala de Caguas, en el caso EAC96-0047, en la cual se reconoció un camino de servicio temporero como una servidumbre forzosa, gravando el fundo de los demandantes esposos Príncipe.
La Juez Pesante Martínez concurre con el resultado, sin opinión escrita.
NOTMQUESE.
Lo aprobó el Tribunal y lo certifica la Secretaria General.
Aida Ueana Oquendo Graulau
Secretaria General